

FILED

MAR 1 2 2019

Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEM COUNCIL and ALLIANCE FOR THE WILD ROCKIES, | CV 18-55-BLG-SPW |
| Plaintiffs, | ORDER |
| vs. | |
| DONATO JUDICE, Acting Associate State Director, the BUREAU OF LAND MANAGEMENT, DEPARTMENT OF THE INTERIOR, an agency of the United States, | |
| Defendants. | |

Plaintiffs Native Ecosystem Council and Alliance for the Wild Rockies have

filed a motion for summary judgment (Doc. 46) on all their claims against

defendants (collectively the "Bureau of Land Management" or "BLM"). BLM

responded by filing a cross motion for summary judgment. (Doc. 59). For the

reasons stated below, the Court grants Plaintiffs' motion for summary judgment in

part and denies it in part and grants BLM's motion for summary judgment in part and denies it in part.

## I.   Legal Standard

Plaintiffs challenge BLM's actions under both the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA"). Because neither Act contains provisions allowing a private right of action, *see Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990), a party can obtain judicial review of alleged violations of those acts only under the waiver of sovereign immunity contained within the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

Under the APA, the court must set aside a federal agency action if it is "arbitrary and capricious," outside the scope of the agency's statutory authority, or otherwise not in accordance with the law. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994). An agency's action is arbitrary and capricious if it fails to consider important aspects of the issues before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law. *The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

The arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity. *San Luis & Delta-*

*Mendota Water Authority v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citing

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).

Thus, "[e]ven when an agency explains its decision with 'less than ideal clarity,' a

reviewing court will not upset the decision on that account if the agency's path

may be reasonably discerned." *San Luis*, 629 F.3d at 1074. The deference given

"is especially strong where the challenged decisions involve technical or scientific

matters within the agency's area of expertise. *Id.* If the agency's exercise of

discretion is truly informed, then the court defers to it. *Id.* It is not the reviewing

court's task to "make its own judgment about" the appropriate outcome. *Id.* (citing

*River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010)).

"The court's responsibility is narrower: to determine whether the" agency

complied with the procedural requirements of the APA. *Id.*

## II.    Factual Background and Procedural History

This dispute centers around BLM's actions pertaining to public lands in the

Iron Mask Planning Area ("Planning Area").  The Planning Area is located in

central Montana, on the east side of the Elkhorn Mountain range, near Canyon

Ferry Reservoir and the city of Townsend.  (Doc. 26-3 at 11).  The Planning Area

covers 124,933 total acres and is managed by the BLM, the U.S. Forest Service

and the U.S. Bureau of Reclamation.  (*Id.* at 15).  BLM-managed lands within the

Planning Area consist of 19 separate parcels totaling 26,235 acres.  (*Id.*).  Of

importance to this case, a portion of this area consists of 5,566 acres that BLM acquired in 2007. (*Id.* at 16).

In 2009, BLM issued the Butte Range Management Plan ("RMP"), to provide a single, comprehensive land use plan to guide management of certain public lands, including the Planning Area. (Doc. 26-8 at 252). Relevant here, in the RMP, BLM authorized the expansion of the Indian Creek Allotment, a portion of land within the Planning Area, and combined the Indian Creek Allotment with the recently acquired 5,566 acres. The RMP designated the total area as the Indian Creek Forage Reserve Allotment ("the Allotment").[1] (*Id.* at 270). The RMP also designated sections of the Elkhorn mountains relevant here as an Area of Critical Environmental Concern ("ACEC"). (Doc. 26-4 at 20). The ACEC designation "indicates to the public that an area has significant values and has established special management measures to protect those values." (Doc. 26-3 at 60). In addition, the designation serves as a reminder that significant values or resources exist which must be accommodated when future management actions and land use proposals are considered within or near an ACEC. (*Id.*).

In 2012, BLM recognized a need to address management issues for the Allotment and other BLM lands within the Planning Area, including but not

---

[1] A forage reserve allotment is an allotment without a term grazing permit that is grazed on a temporary non-renewable basis. (Doc. 26-3 at 269).

limited to grazing authorizations and livestock management, upland vegetation health, the health of riparian areas, and fencing. (*Id.* at 4). Accordingly, BLM began scoping and public involvement for the preparation of an environmental assessment ("EA") for the Planning Area. (*Id.* at 2).

In 2014, BLM completed the draft Iron Mask Planning Area Environmental Assessment ("EA"), which analyzed "a variety of management actions developed to: improve land health and enhance biodiversity; continue to provide for livestock grazing; address management needs in the area acquired in 2007, [. . .] and to establish a forage reserve allotment as required in the [RMP]. (Doc. 10-4 at 1). Most of the area analyzed within the EA is found within the Elk Mountains ACEC. (Doc. 26-3 at 60). On June 6, 2014 BLM released and sought public comments on the draft EA. (Doc. 10-4 at 1). Plaintiffs filed comments in response. (Doc. 26-8 at 916-106).

On July 1, 2015, BLM issued a Decision Record for the EA that adopted Alternative B (the Preferred Alternative) and entered a Finding of No Significant Impact ("FONSI") that would be implemented in separate decisions. (Doc. 26-3 at 171-173). The separate decisions included the Decision Record for Vegetation and Riparian Treatments issued on July 1, 2015, (*id.* at 174-177), and the Final Grazing

Decision and Response to Protest for the Indian Creek Forage Reserve issued on

March 7, 2016. (*Id.* at 204-233).[2] Plaintiffs challenge both of these decisions.

## A.     Vegetation and Riparian Treatments

BLM's Final Decision on the Vegetarian and Riparian Treatments

implements Alternative B of the Final Iron Mask EA.  The Final Decision includes

treating up to 5,397 total upland acres in six separate units over the course of

several years to reduce conifers and restore grass/shrub habitat.  (Doc. 26-3 at 175-

76).  Up to 978 of those acres will be subject to prescribed fire and the rest treated

by hand or mechanical means.  Treatments will be done in a mosaic pattern with

patches left untreated for habitat diversity and hiding cover for wildlife.  (*Id.*).

## B.     Grazing in Indian Creek Forage Reserve

BLM's Final Decision implements Alternative B of the Final Iron Mask EA

with respect to the management of the Indian Creek Forage Reserve Allotment.

(Doc. 26-3 at 208).  Alternative B follows the RMP's directive to manage the

Allotment as a forage reserve usable by permittees of other allotments, on a

temporary basis, when their own allotments are unavailable or unusable due to

events like drought, fire, vegetation treatments, or other agency project work.  (*Id.*)

The Final Decision sets forth grazing restrictions and, as a forage reserve

allotment, the Forage Reserve would not be subject to sustained annual livestock

---

[2] Hereinafter referred to collectively as "challenged decisions."

use. Instead, the Final Decision, allows for only periodic use. The Decision

implements a two-pasture system (East and West pastures) on the Allotment and

leaves approximately 775 acres of isolated tracts unused. (*Id.* at 210).

The Final Decision also includes construction of range improvements

necessary to use the Allotment as a forage reserve, including removing and

replacing fencing, water pipeline installation, updating head boxes, riparian

exclosures, and water developments. (*Id.* at 209).

## III. Discussion

Plaintiffs argue that BLM violated the APA by failing to comply with the

requirements of National Environmental Policy Act and the Federal Land Policy

Management Act. The Court discusses each in turn below.

### A. NEPA Challenges

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-

4370, is the basic "national charter for protection of the environment. 40 C.F.R. §

1500.1(a). It is a procedural statute that requires Federal agencies to assess the

environmental consequences of their actions before the actions may be undertaken.

NEPA has "twin aims." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062,

1065 (9th Cir. 2002). First, it requires a federal agency to consider every

significant aspect of the environmental impact of a proposed action. *Id.* Second, it

ensures that the agency will inform the public that it has considered environmental

concerns in its decision-making process. *Id.* NEPA does not contain any substantive environmental standards. Instead it establishes "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences. *Metcalf v. Daley*, 214 F.3d 1135, 1141-42 (9th Cir. 2000) (internal citations omitted).

Under these procedures, an agency must identify those actions which normally require an environmental impact statement ("EIS"). *See* 40 C.F.R. § 1501.4(a)(1). Some actions categorically require an EIS. If an EIS is not categorically required, agencies must perform an environmental assessment ("EA") to determine whether a particular proposed action requires the preparation of an EIS. If the EA reveals that the agency must prepare an EIS, then the agency must prepare one. If the EA reveals no significant effect, the agency may issue a Finding of No Significant Impact ("FONSI"). *See* 40 C.F.R. §§ 1501.4, 1508.9; *see also Kern*, 284 F.3d at 1067.

Because NEPA is essentially a procedural statute, judicial "review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Resp. Dev. v. U.S. Army Corps of Eng'rs,* 524 F.3d 938, 947 (9th Cir. 2008). "An agency's decision can be set aside only if the agency relied on factors Congress did not intend it to consider,

entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Earth Island Institute*, 697 F.3d at 1013. It is the plaintiff's burden to show that an agency failed to comply with NEPA. *Kleppe v. Sierra Club*, 427 U.S 390, 412 (1976).

In reviewing the sufficiency of an agency's NEPA analysis, a court should evaluate whether the agency has presented a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Relief will not be granted for NEPA violations if the decision-maker was otherwise informed as to the environmental consequences and NEPA's goals were met. *Id.*

Here, Plaintiffs contend that BLM violated NEPA by failing to "take a hard look" at: (1) the direct and indirect impacts of the challenged decisions on the ACEC; (2) the direct and indirect impacts of the challenged decisions on wildlife, including special status species; and (3) the cumulative impacts of the challenged decisions. As a threshold issue, however, the Court must resolve its scope of review in determining whether BLM took a "hard look."

### 1. The scope of the Court's review is broader than Plaintiffs suggest.

In support of each of its arguments that BLM violated NEPA, Plaintiffs cite *Klamath-Siskiyou Wildlands Center v. BLM*, 387 F.3d 989, 996 (9th Cir. 2004), and allege that BLM provides only conclusory statements in support of the challenged decisions, in violation of NEPA. (*See* Doc. 47 at 15, 19, 21, 24, 30; Doc. 64 at 12). In *Klamath-Siskiyou*, the EA contained only "narratives of expert opinions," provided no hard data, and otherwise failed to provide the public with a basis for evaluating the impact of the agency action. *Id.* at 996. The Ninth Circuit held that, "[W]hile the conclusions of agency experts are surely entitled to deference, NEPA documents are inadequate if they contain only narratives of expert opinions." *Klamath–Siskiyou Wildlands Ctr.*, 387 F.3d at 996.

BLM argues that by viewing various sections of the EA in isolation, Plaintiffs' argument ignores a fundamental principal: that the EA is an integrated document which must be weighed in its entirety. (Doc. 60 at 17) (citing *North Slope Borough v. Andrus*, 624 F.2d 589, 601 (D.C. Cir. 1980)). BLM argues that a comprehensive review of the EA demonstrates that BLM analyzed the environmental impacts of the challenged decisions on the entire planning area, and that the underlying data BLM relied upon for its analysis is contained in the RMP, to which the EA is tiered. (Doc. 60 at 17).

The Court agrees that it must not limit its review to isolated statements in the EA. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir.2002) ("Tiering, or avoiding detailed discussion by referring to another document containing the required discussion, is expressly permitted" and encouraged under NEPA, so long as the tiered-to document has been subject to NEPA review."). Tiered analyses are viewed as a whole to determine whether they address all the impacts. *S. Or. Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983). The Court finds tiering particularly relevant here because of the relationship of the RMP to the EA in this particular case.

In 2009, the RMP authorized the vegetation and riparian treatments at issue, (Doc. 26-3 at 260-63), and also authorized grazing in the Planning Area in the EIS. (*Id.* at 210; 269-70). The RMP also sets forth the prescriptions for managing the Elkhorn Mountain ACEC, in which a large part of the Decision Area is found. (Doc. 26-4 at 299-300). The EA implements the relevant objectives established in the RMP for the Planning Area. Accordingly, the RMP provides the underlying data and analysis upon which the EA analysis relies. With this appropriate scope of review in mind, the Court turns to Plaintiffs specific arguments.

a.     **Elkhorn Mountains ACEC**

Plaintiffs argue that BLM failed to adequately analyze the direct and indirect impacts of the vegetation management and grazing decisions on the ACEC in

violation of NEPA. (*Id.* at 14). Plaintiffs argue that the EA's only analysis of the challenged decisions' impacts on the ACEC are, respectively:

> Vegetation treatments proposed under the action alternatives would restore those areas to a more natural state and improve habitat for grassland and shrubland dependent species. The relevance and importance criteria for which the ACEC was designated are not anticipated to be adversely impacted by either alternative.

(Doc. 26-3 at 111).

. . .

> Cattle grazing could occur on the Indian Creek forage reserve allotment. This could result in some competition for forage between cows and herbivorous wildlife. However, water developments would improve water availability for wildlife and increase dispersal throughout the allotment of wildlife and cows.

(*Id.*).

In response, BLM argues that a comprehensive review of the entire EA shows that the decisionmaker and the public were informed of the environmental impacts of the proposed decisions on the whole planning area, including the ACEC. (Doc. 60 at 17). The Court agrees.

First, the Court finds that the EA's extensive analysis of the alternatives is critical in considering whether BLM took a "hard look" at the impacts of its actions on the ACEC. Over 37 pages, the EA describes the features and mitigation measures common to the three action alternatives, Alternative A (the no action alternative), Alternative B (the preferred alternative), and Alternative C. The EA

discusses travel management, recreation, livestock management, conifer treatments, prescribed fire, riparian and aquatics, stream crossings, soils, water development, cultural resources and wildlife. (Doc. 26-3 at 22-59). Specifically, the EA states that the alternatives section "covers project design features that would be implemented to protect resource values[.]" (*Id.* at 22).

Next, the EA analyzes the affected environment and the environmental impacts of the proposed alternatives for the entire Planning Area over 65 pages. (*Id.* at 60-125). The EA also sets out a table summarizing those impacts. (*Id.*).

With respect to the effects of grazing livestock, the EA describes and analyzes, among other things, the positive and negative effects from livestock disturbing the native plants, including increased seed production for germination and microsites for germination, the benefits of removing no more than 40% of the plants' vegetative material, and that while available forage would be consumed by livestock, the disturbance associated with the livestock operations would be a tool to help increase vigor and reproductive opportunities for plants, which in turn would result in greater native plant production. (*Id.* at 16, 21, 23, 26, 32-44, 269-71). The EA relied on Health Assessments from 1999 to 2012 to determine which areas were impacted by grazing, if and which allotments would benefit or experience harm from grazing, and what impacts to the vegetation and wildlife were expected to occur as a result of each alternative. (*Id.* at 71-84).

Similar analysis may be found with respect to the effects of the vegetative and riparian treatments. The EA describes the existing condition of the vegetation in the Planning Area and then discusses the alternatives' potential impacts to the vegetation, specifically four different categories of vegetation: special status plants, invasive and non-native species, fires and fuels, forestry, and grassland and shrublands. (*See* Doc. 84-95).

The EA considers the Riparian Resources analyzed in the RMP and analyzes the potential impacts in the riparian habitats. (*Id.* at 96-103). Again, as with the grazing analysis, this discussion includes the Indian Creek Forage Reserve Allotment, which is located directly within the ACEC. (*Id.* at 101-102).

The EA analyzes and considers the basis for minimum stubble height implementation, construction of exclosures around spring sources, and uses for let-down fences in order to reduce vegetation and riparian area destruction. (*Id.* at 100-104). The EA recognized that the proposed activities would help restore the lands within the Planning Area, specifically the Indian Creek Forage Reserve Allotment (which had been previously overgrazed), to their historic vegetation condition. (*Id.* at 106-07, 159).

This analysis is notable because the EA's values for the entire Planning Area – wildlife, habitat, and unique management area – are also the primary values of the smaller ACEC area. (*See* Doc. 26-3 at 109). Specifically, the EA states, in

relevant part, "Management of the [ ] ACEC is focused primarily on the following values as described on pages 54-55 of the Butte RMP: Diverse upland and aquatic habitat for wildlife and fish [and] unique national management area [. . . ]. For the Iron Mask DA, wildlife, habitat, and unique management area are the primary values." (*Id.* at 109). Comparatively, under the Affected Environment and Environmental Impacts Section of the EA, Table 3: Critical Elements of the Human Environment, the EA states "Most of the Decision Area is within the Elkhorns ACEC. The alternatives presented in this EA are designed to protect the values of this area." (*See* Doc. 26-3 at (67)).

In other words, the values necessary to the ACEC analysis were analyzed as part of the greater EA analysis in the alternatives section. Thus, the section specifically discussing the ACEC must be considered in conjunction with the prior 65-page alternatives affected environment and impacts analysis. Also, because the EA's alternatives are designed to protect the same values as the ACEC, whose management is set out in the RMP, the RMP also possesses critical information underlying BLM's analysis of the direct and indirect consequences of the decisions on the ACEC, including proper management guidance. (Doc. 26-4 at 20-21).

After considering the EA as a cumulative document and tiered to the RMP, the Court finds that BLM adequately analyzed the direct and indirect impacts of both decisions on the ACEC. As discussed above and unlike in *Klamath-Sikiyou*

*Wildlands Ctr.*, BLM not only incorporated the entire alternatives discussion into its ACEC analysis in the EA, it also incorporated the data underlying its ACEC discussion through reference to the publicly-available RMP. (Doc. 26-3 at (65) *See* 40 C.F.R. § 1502.21; *see also WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015). The Court finds BLM took a "hard look" at the challenged decisions' impact on the ACEC.

### b.    Wildlife, Special Status Species

Plaintiffs argue that BLM failed to take a "hard look" required by NEPA of the impacts of the vegetation and grazing actions' impacts on wild life and special status species in the Planning Area. (Doc. 47 at 2-10). Plaintiffs argue that the EA's analysis consists only of conclusions, does not provide baseline data or analysis on wildlife, and is inadequate. (Doc. 47 at 17). Once again, BLM argues that Plaintiffs fail to take the entire EA and tiered RMP into consideration in their argument. The Court agrees.

With respect to the effects of vegetation treatment and grazing on wildlife and special status species, Plaintiffs take issue with the fact that grazing, and the corresponding actions that occur such as fencing, have been authorized within the Planning Area. (*See id.* at 24-25; Doc. 64 at 1-2). Plaintiffs make similar arguments with respect to the vegetation and riparian treatments. (*Id.* at 64 at 4, 8). But what Plaintiffs overlook is that the vegetation treatments and grazing in the

Planning Area, and more specifically within the Indian Creek Forage Reserve Allotment, were authorized by the RMP, not the EA. (Doc. 26-3 at 205; 260-61, 266-72). In other words, the decisions implement the objectives already authorized by the RMP. (*Id.* at 16).

The RMP provided the objectives and authorization for treating grassland and shrubland, reducing conifer colonization resulting from long term fire suppression and historic grazing practices, and treatment to move towards a more desired ecological condition of open grasslands and shrublands with a low density of tree species in the Planning Area. (*Id.* at 260). The RMP also determined that vegetative treatments would include "cutting non-commercial conifers that have encroached into grassland or sagebrush habitats, and that prescribed burning will be used to treat forest, grassland, or shrubland vegetation types." (*Id.*). Moreover, the RMP requires BLM to focus on restoring "historic vegetative conditions" using these treatments. (*Id.* at 17, 260). Accordingly, Plaintiffs' contention that the decision to implement vegetation and riparian treatments was not adequately analyzed does not articulate an issue with the EA, but rather with the RMP, which Plaintiffs apparently failed to challenge.

Similarly, Plaintiffs argue that "the agency did not provide a basis for their rationale for the claim that adding grazing to this wildlife management area will benefit the wildlife." (Doc. 64 at 17). But the RMP, not the EA authorized

grazing and structural projects supporting grazing in the Indian Creek Forage Reserve Allotment. (*Id.* at 205, 216). The RMP determined that using the forage reserve allotment will facilitate completion of the vegetation treatment projects by allowing adequate rest and recovery periods on allotments undergoing vegetation treatment projects, in turn contributing to an overall improvement in vegetation health. (*Id.* at 269-272). Again, Plaintiffs' contention that the decision to implement grazing was not adequately analyzed, including its impacts on wildlife and special status species, is an issue with the RMP, which Plaintiffs failed to challenge.

The Court concludes that Plaintiffs failed to meet their burden to show that BLM did not take a "hard look" at the possible impact of the challenged decisions on the wildlife and special status species in the Project Area.

### c. Cumulative Impacts

"NEPA requires an agency to consider" cumulative effects, which "result[ ] from the incremental impact of the action when added to other past, present and reasonably foreseeable actions regardless of what agency . . . or person undertakes such other actions." *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005) (internal quotation marks omitted); see also 40 C.F.R. § 1508.7 (defining cumulative impacts in this way). "Consideration of cumulative impacts requires some quantified or detailed information" that results in a "useful analysis," even

when the agency is preparing an EA and not an EIS. *See Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (internal quotation marks omitted). When there is no EIS containing a cumulative effects analysis, "[T]he scope of the required analysis in the EA is correspondingly increased." *Id.* at 1077. "Without such information, neither the court nor the public ... can be assured that the [agency] provided the hard look that it is required to provide." *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d 592, 603 (9th Cir. 2010).

"[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Kern,* 284 F.3d at 1077. An agency may, however, characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area. *See, e.g., League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1135 (9th Cir. 2010). The cumulative impact analysis must be more than perfunctory; it must provide a "useful analysis of the cumulative impacts of past, present, and future projects." *Kern*, 284 F.3d at 1075.

Plaintiffs argue that while BLM discloses multiple past treatments within and adjacent to the Planning Area, the EA fails to provide any detailed information of past, present and reasonably foreseeable treatments or their cumulative impacts. (Doc. 47 at 30); *see* 40 C.F.R. § 1508.7. In response, BLM argues that it

adequately considered the cumulative impacts of the grazing decision and the vegetation decision when it addressed the cumulative effects common to all alternatives, and the cumulative effects of the specific alternatives. (Doc. 60 at 24-25). As Plaintiffs point out, however, BLM fails to disclose the impacts of past and future vegetation treatments in violation of NEPA. *See Kern*, 284 F.3d at 1076.

BLM's entire analysis of the cumulative impacts of the challenged decisions on the Planning Area is contained in Section 3.5 of the EA. (Doc. 60 at 18-19). Section 3.5 is entitled cumulative impact analysis, but it is limited to an analysis of the positive impacts of the present treatments solely within the Planning Area. Nowhere in Section 3.5 does BLM attempt to analyze possible spill-over effects of the challenged decisions on the impacts to vegetation or wildlife inside the Planning Area. For example, it proposes prescribed burn within the Planning Area, but makes no attempt to analyze how the areas within the Planning Area are impacted by prescribed burns already occurring outside the Planning Area. BLM concedes that areas outside the Planning Area have undergone prescribed burning but fails to analyze if and how that impacts vegetation and wildlife in light of the prescribed burns slated for the Planning Area. Further, the EA makes no attempt to analyze the cumulative impacts of the challenged actions when combined with "reasonably foreseeable future actions" or past actions (such as other prescribed

burns) outside the Planning Area. BLM points the Court to Table 32 as an example of "adequate consideration of cumulative impacts." (Doc. 60 at 26). Plaintiffs point out, however, that Table 32 "contains a summary of the existing conditions and compares key effects by alternative for each resource or issue." (Doc. 26-3 at 124). In other words, the Table does not, as BLM suggests, include any analysis of the cumulative impacts of past or reasonably foreseeable vegetation projects.

Even assuming there are no past projects or activities that would have a cumulative effect when considered along with the challenged actions, BLM must still "characterize the cumulative effects of past actions in the aggregate." *Ctr. for Envtl. Law & Policy*, 655 F.3d 1000, 1007 (9th Cir. 2011). Without that analysis, "neither the court nor the public ... can be assured that the [agency] provided the hard look that it is required to provide." *Te–Moak Tribe of W. Shoshone of Nev.*, 608 F.3d 592, 603 (9th Cir. 2010)(citations and internal quotation marks omitted). The Court finds that Section 3.5 demonstrates that BLM has not performed a cumulative impact analysis as that term is used in Ninth Circuit law.

## B.    FLPMA

Plaintiffs argue that BLM violated FLPMA by failing to comply with the RMP's requirement to manage the ACEC to support wildlife. (Doc. 47 at 31). The FLPMA requires the BLM to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). Multiple use requires

balancing the competing uses of land, 43 U.S.C. § 1702(c); sustained yield requires the BLM to control depleting uses over time, *id.* § 1702(h); *see also Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 58 (2004).

BLM does this by using a "multi-step planning and decisionmaking process" that begins with the formation of a land use plan, an RMP, for a geographic region. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 504 (D. C. Cir. 2010); *see* 43 C.F.R. § 1601.0-5(n) (describing contents of resource management plan). The RMP "does not, however, include a decision whether to undertake or approve any specific action. Specific projects are reviewed and approved separately but must conform to the relevant [plan]." *Theodore Roosevelt*, 616 F.3d at 504 (citing 43 C.F.R. §§ 1601.0-5(n), 1610.5-3(a)); *see also Norton*, 542 U.S. at 59-60.

"Conformity or conformance means that a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment." 43 C.F.R. § 1601.0-5. When an action is not consistent with the RMP, the RMP may be amended. *Id.* § 1610.5-3(c).

Plaintiffs also argue that BLM cannot demonstrate compliance with the RMP's requirement to "emphasize protection and restoration of habitats for native wildlife, plants and special status species" because BLM failed to analyze the

impacts of the challenged decisions on wildlife, including special status species, and on the ACEC that contains species with special needs. (Doc. 47 at 33-34).

In response, BLM first argues that Plaintiffs failed to provide BLM notice of their FLPMA argument during the administrative process, so the argument is waived. On the merits, BLM argues that Plaintiffs' argument fails because Plaintiffs fail to support their argument with any evidence supporting inconsistency between the challenged actions and the RMP's management objectives. (*Id.* at 78 at 11). Even if the argument is not waived, however, BLM argues that Plaintiffs failed to provide any evidence in support of their argument and attempt to flip the burden. (Doc. 78 at 11-12). The Court agrees.

Other than rehashing their NEPA arguments, Plaintiffs fail to point to any specific examples of how the challenged decisions are inconsistent with the RMP's requirements. Nor do Plaintiffs provide any specifics on how the EA fails to comply with the RMP's requirement to manage the ACEC to support wildlife. Instead, Plaintiffs argue that BLM cannot demonstrate that the decisions are consistent with the RMP, but it is not BLM's burden to make such demonstrations.

Moreover, the record suggests that the vegetation treatment and grazing decisions are fully consistent with the RMP's goals of reducing conifer encroachment and restoring grass and shrublands within the Planning Area,

including the Indian Creek Forage Reserve Allotment. (*See e.g.* Doc. 26-3 at 19, 30, 32, 45, 211-213, 270-71). The Court concludes BLM did not violate FLPMA.

## IV. Conclusion

For the reasons stated above, the Court GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment (Doc. 46), and GRANTS in part and DENIES in part BLM's cross motion for summary judgment (Doc. 59). Specifically:

1. The Court grants Plaintiffs' motion and denies BLM's motion in that BLM violated NEPA by failing to take a hard look at cumulative impacts.

2. The Court grants BLM's motion and denies Plaintiffs' motion in all other respects.

It is FURTHER ORDERED that this matter is REMANDED to BLM so that it may prepare a supplemental environmental assessment consistent with this order and the law.

It is FURTHER ORDERED that the defendants are enjoined from implementing the challenged actions while the proceedings required on remand are pending.

Based on this Court's ruling on the summary judgment motions, Plaintiffs' second motion for preliminary injunction (Doc. 65) is DENIED as moot.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment and close this case.

DATED this _12th_ day of March 2019.

SUSAN P. WATTERS
United States District Judge